**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Kent M. Maupin | : | |
| | : | |
|    and | : | |
| | : | |
| Lee Ann Cottrell | : | |
| | : | |
|    and | : | |
| | : | |
| Stephen M. Spencer | : | **COMPLAINT** |
| | : | |
| | : | |
| | : | |
|            Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SYRIAN ARAB REPUBLIC | : | |
| Damascus, SYRIA | : | |
| | : | |
| and | : | |
| | : | |
| Syrian Military Intelligence | : | |
| (al-Mukhabarat al-`Askariya) | : | |
| Syrian Ministry of Defense | : | |
| Omayad Square | : | |
| Damascus, Syria | : | |
| | : | |
| and | : | |
| | : | |
| President Bashar al-Asad | : | |
| Damascus, SYRIA | : | |
| | : | |
| and | : | |
| | : | |
| General `Asif Shawkat | : | |
| Kafar Susa Roundabout | : | |
| Damascus, SYRIA | : | |
| | : | |
| | : | |
|            Defendants | : | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .........:

**COMPLAINT**

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq*. (hereinafter "FSIA").  This action arises out of the personal injuries and wrongful death of Keith Matthew Maupin in or near Baghdad, Iraq preceding November 20, 2008.  This murder was carried out by terrorist organizations operating with material support and resources provided by the Syrian Arab Republic (hereinafter "Syria") as a state-sponsor of terrorism and by the other Defendants who supported these acts of terrorism against United States citizens.  The terrorists committed, and Keith Matthew Maupin was the victim of, acts of "torture" and "extrajudicial killings" as defined in the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and "personal injury" and "death" as required by 28 U.S.C. § 1605A.

Plaintiffs state in support of their Complaint and allege the following:

**THE PARTIES**

A.    **The Plaintiffs**

1.    This action is brought by the Plaintiffs, by and through their counsel, in the individual capacity of each Plaintiff and for the benefit and on behalf of all those legally entitled to assert a claim under the FSIA, and state common law and statutory law.

2.    Plaintiff Kent M. Maupin at all times relevant hereto was and is the sibling of Keith Matthew Maupin. Plaintiff Kent M. Maupin is a citizen of the United States of America who resides in the State of Ohio. His father is Keith Maupin and his mother is Carolyn Maupin.  Plaintiff Kent M. Maupin can sue and be sued in this Court.

3.    Plaintiff Lee Ann Cottrell at all times relevant hereto was and is the sibling of Keith Matthew Maupin. Plaintiff Lee Ann Cottrell is a citizen of the United

States of America who resides in the State of Indiana.  Her father is Jack Spencer and her mother is Carolyn Maupin.  Plaintiff Lee Ann Cottrell can sue and be sued in this Court.

4.      Plaintiff Stephen M. Spencer at all times relevant hereto was and is the sibling of Keith Matthew Maupin. Plaintiff Stephen M. Spencer is a citizen of the United States of America who resides in the State of Ohio.  His father is Jack Spencer and his mother is Carolyn Maupin.  Plaintiff Stephen M. Spencer can sue and be sued in this Court.

**B.**          **The Defendants**

5.      Defendant Syria is a foreign state that was designated as a state sponsor of terrorism pursuant to section 60 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620(A) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, on December 29, 1979, and has remained so designated, continuously, ever since.  Syria has been included on the U.S. State Department's list of state sponsors of terrorism longer than any other state.

6.      The U.S. State Department in its Country Reports on Terrorism 2009 states that in the late 1990s, Abu Mus'ab al-Zarqawi (al-Zarqawi), organized a terrorist group called al-Tawhid wal-Jihad (TWJ) in opposition to the presence of U.S. and Western military forces in the Islamic world and also the West's support for the existence of Israel. In late 2004, al-Zarqawi joined al-Qaeda and pledged allegiance to Usama bin Laden. After this, TWJ became known as al-Qaeda in Iraq (AQI). In January 2006, AQI created and led the Mujahidin Shura Council (MSC), an umbrella organization incorporating the various Sunni terrorist groups in Iraq.  AQI claimed its attacks under the MSC banner until mid-October 2006.

7.      Syria, at all times pertinent to this action, provided material support and resources to al-Zarqawi, to his successor Abu Ayyub al-Masri a.k.a. Abu Hamza al-Muhajir (al-Masri), and to the terrorist organization that al-Zarqawi and later al-Masri built and led, known alternatively as TWJ, AQI and MSC (collectively, for purposes of this Complaint, AQI).

8.      Al-Zarqawi, al-Masri and AQI have carried out a murderous campaign of terrorism in, among other places, Iraq and Jordan, with the sponsorship, material support and resources furnished by Syria.  Syria, through its actions, is and has been a State sponsor of al-Zarqawi, al-Masri and AQI, within the meaning of 28 U.S.C. § 1605A and the Flatow Amendment, by providing him with funding, equipment, arms, direction, logistical support, and/or training for their terrorist activities.

9.      Defendant Syrian Military Intelligence is the principal Syrian intelligence service through which Syria sponsored al-Zarqawi, al-Masri and AQI, which caused the terrorist acts described below.

10.     Defendants President Bashar al-Assad and General `Asif Shawkat performed acts within the scope of their respective offices, which caused the extrajudicial killings and personal injuries resulting from the acts of terrorism described herein. Accordingly, said Defendants are jointly and severally liable to Plaintiffs.

11.     Syria as well as the Syrian Military Intelligence, President Bashar al-Assad and General `Asif Shawkat, are directly and/or vicariously responsible for the actions of their co-defendants because they materially supported and sponsored al-Zarqawi, al-Masri and AQI.  Accordingly, Defendants are jointly and severally liable to Plaintiffs.

## JURISDICTION AND VENUE

12.     Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2) and 1605A.

13.     Syria and the Syrian Military Intelligence are subject to suit in the courts of the United States as sponsors of and participants in al-Zarqawi, al-Masri and AQI's activities pursuant to the FSIA and related statutes.

14.     Defendants President Bashar al-Assad and General `Asif Shawkat are subject to suit in the courts of the United States pursuant to the FSIA and related statutes.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

16.     28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a state sponsor of terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing or the provision of material support and resources for such acts.

17.     28 U.S.C. § 1605A(b) provides that suits under 28 U.S.C. § 1605A(c) must be commenced not later than 10 years after the cause of action arose.  Though Keith Matthew Maupin was captured on April 6, 2004, his fate remained uncertain until his remains were found four years later on March 20, 2008.  His remains were not conclusively identified with DNA technology until the publication of an autopsy report on April 9, 2008.  On November 28, 2008, the United States Department of Defense

made its very first public disclosure of the identity of the terrorist organization

responsible for the kidnapping and murder of Keith Matthew Maupin.

## THE KIDNAPPING, TORTURE AND MURDER
## OF KEITH MATTHEW MAUPIN

18.   On March 20, 2003, a multinational force led by the United States invaded

Iraq.  The force toppled the regime of Saddam Hussein, and commenced a long-term

occupation intended to create the conditions necessary for the creation of a democratic

form of government in Iraq.  Syria formally opposed the invasion and occupation.

Syria's foreign minister stated publicly that it was in Syria's interest to see the American

invasion of Iraq fail.

19.   Prior to and during the American invasion of Iraq, al-Zarqawi and AQI

shifted their focus to Iraq, and to ejecting the United States from Iraq.  Al-Zarqawi

concentrated his network in an area of Iraq known as the "Sunni Triangle" which he

divided into different operational sectors, each led by a different lieutenant.

20.   Al-Zarqawi appointed Haji Hammadi as the emir, or leader, of Karmah in

eastern Anbar province and Abu Ghraib, an al-Qaeda haven to the west of Baghdad.

21.   In 2002 Keith Matthew Maupin was a twenty year-old student at the

University of Cincinnati.  Struggling to pay his university fees, he enlisted in the U.S.

Army.  After basic training, he completed additional training for the Military

Occupational Specialty of Motor Transport Operator.  He was trained primarily to drive

military trucks. He was assigned in the rank of Private First Class to the 724th

Transportation Company, 7th Transportation Battalion, 172nd Corps Support Group, 13th

Corps Support Command.

22.     Maupin arrived in Kuwait on February 20, 2004.  He arrived at his duty station at Camp Anaconda, Iraq, in the heart of Sunni Triangle, on March 5, 2004. Maupin's primary duty at Camp Anaconda was to drive military fuel tanker trucks.

23.     The U.S. Army had contracted with the private American defense contractor Kellogg Brown and Root (KBR) to provide fuel delivery services.  KBR fuel tanker trucks and KBR employees were located at Camp Anaconda, and were used to deliver fuel to destinations in Iraq.

24.     Fuel convoys often consisted of both Army and civilian KBR fuel tanker trucks.  Neither the Army nor the civilian KBR fuel tanker trucks were armored, and neither was equipped with weapons systems.  These fuel convoys were not on offensive missions to attack terrorists or others.  Their authorized mission was simply to deliver their fuel cargo along authorized routes to its intended destination. If necessary, the fuel tanker trucks could corral themselves into a defensive "Israeli box formation" for protection, while air support was called in to deal with any attackers.

25.     "Gun trucks" separated every third or fourth fuel tanker truck.  These were U.S. Army cargo trucks, with a soldier driving, a soldier manning a gun mounted on top of the truck cab, and a soldier manning a gun mounted in the truck bed.  The authorized mission of these "gun trucks" was purely defensive. The Army soldiers in "gun trucks" were ordered that, if attacked, they were authorized to return fire defensively.  However, they were not authorized to pursue their attackers, and they were not authorized to initiate attacks.

26.    On April 6, 2004, in response to the American led attack on Falloujah which had commenced the day before, al-Zarqawi issued this call to arms to AQI: "Sharpen your swords and burn the earth under the feet of the invaders."

27.    Three days later, on April 9, 2004, a significant day since it was the first anniversary of the day the allies reached Baghdad in the invasion of Iraq, AQI ambushed a fuel convoy that had departed from Camp Anaconda, carrying jet fuel to the Baghdad International Airport.  The convoy stretched for approximately one mile on an expressway leading to the airport, and came under a sustained attack for approximately five miles.

28.    This civilian convoy was under the control and command of KBR and its civilian employees, and not under U.S. military control or command.  Civilian KBR employees drove every truck in the convoy, both the civilian KBR fuel tanker trucks and the Army fuel tanker trucks.   Matt Maupin sat in the passenger seat of a military fuel tanker truck driven by a civilian KBR employee.  There were approximately three "gun trucks" interspersed in the convoy.

29.    The terrorists used women and children as human shields during the attack, in order to discourage return fire.  The terrorists attacked with improvised explosive devices, rocket-propelled grenades, mortars and large caliber machine guns.

30.    The civilian KBR driver of the fuel tanker truck in which Maupin was riding was struck by fire and killed.  The truck burst into flames and swerved off the road.

31.    The remnants of the convoy eventually arrived at Baghdad International Airport.  It was discovered that Maupin and one other soldier were missing.

32.    Seven days later, on April 16, 2004, the Arabic language television network Al-Jazeera, based in Qatar, broadcast a videotape that had been delivered to the U.S. Embassy in Doha, Qatar.  It showed Matt alive, surrounded by five terrorists masked in kaffiyehs and holding automatic rifles.  Four years later, the U.S. would identify one of these men as the aforementioned Haji Hammadi.  However, the tape did not include a claim of responsibility by AQI or otherwise disclose the identity of the individual terrorists shown in the video or their terrorist organization.  "My name is Keith Matthew Maupin," Matt said into the camera. "I am a soldier from the 1st Division."  The terrorists suggested on the tape that Maupin might be traded for terrorists held by U.S. armed forces.

33.    Over four years after the terrorist attack, on March 20, 2008, U.S. Army soldiers executed a special mission to recover the remains of Matt Maupin.  They did recover human remains, approximately twelve miles from the site of the ambush of the convoy, west of Baghdad, and on April 9, 2008, these remains were conclusively identified using DNA technology as the remains of Matt Maupin.

34.    Until March 20, 2008, Matt's family fervently believed he was alive and worked to secure his release by sending care packages and organizing public rallies to press for his safe return. Until the recovery of his remains, his fate was unknown. Matt Maupin's parents had lived for four years with the torment of not having medical proof of their son's death in their possession.

35.    On April 27, 2008, Matt Maupin's remains were finally laid to rest in his hometown in Ohio.

36.    On November 28, 2008, U.S. Army Brigadier General David Perkins, a spokesman for Multinational Force Iraq, stated publicly in a press conference that Haji Hammadi was an AQI leader, that Hammadi had been killed by coalition forces in a raid earlier that month, and that Hammadi was immediately responsible for the abduction and murder of Matt Maupin.

37.    This November 28, 2008 press conference constituted the first public disclosure of the identities of the individual terrorist and the terrorist organization responsible for Matt Maupin's kidnapping and murderer.  Prior to this press conference, their identities remained unknown to the public, including Plaintiffs.

38.    Matt Maupin's kidnapping, torture, public humiliation and murder at the hands of AQI must be understood in terms of the overall hostage strategy pursued by al-Zarqawi in Iraq.  Commencing in April 2004, al-Zarqawi and AQI kidnapped many Americans and other foreigners in Iraq, and then publicly humiliated and executed them in barbaric ways designed to inspire terror.  Al-Zarqawi was seeking media attention for these kidnappings and murders, and to use media attention to turn Western and in particular American public opinion against the ongoing American occupation of Iraq. He was a master of the art of communication, and had established a "media department" within AQI for the purpose of producing videos for circulation to jihadist websites, Al-Jazeera and other media channels at his disposal.  Al-Zarqawi and AQI had publicly humiliated and executed American businessman Nicolas Berg before Matt Maupin was captured, and they also publicly humiliated and executed American businessmen Jack Armstrong and Jack Hensley.  In each case, the captivity and executions were videotaped and broadcast to the world.

## DEFENDANTS' SPONSORSHIP AND MATERIAL SUPPORT OF Al-ZARQAWI, AL-MASRI AND AQI

39.     Defendants' sponsorship and material support of al-Zarqawi, his successor al-Masri and AQI must be understood in terms of the totalitarian nature of the Syrian regime, and in the context of its long history of employing terrorism as a tool for advancing its domestic and international agendas.

40.     The Syrian Arab Republic is a republic in name only.  In reality, it is a dictatorship and police state that strategically exhibits only the external forms of a democratic regime.  Its constitution vests one particular party – the Arab Socialist Ba'ath Party – with leadership functions in the State and society.  It also vests broad powers in the person of the President, making him Secretary General of the Ba'ath Party and leader of the National Popular Front, a coalition of smaller minority political parties that are authorized to exist by the regime in order to create the appearance of a multi-party political system.  The President has the power to issue laws, and since 1963 an Emergency Law has been in force that suspends most constitutional protections for Syrians.  The President controls the legislative process.

41.     In 1966, Syrian Ba'athists conducted a coup d'etat.  The Ba'athists eliminated all political parties in opposition.  Hafez al-Assad was appointed Minister of Defence.  Hafez al-Assad led another coup in 1970, in which the Ba'ath party was purged of internal opposition, its leaders were jailed, and Hafez al-Assad installed as President of the police state.

42.     The al-Assad family has controlled the Syrian regime without interruption for forty years, since 1971. Hafez al-Assad had a three-decade Presidency, lasting from 1971 to 2000, in which he was confirmed President in unopposed referenda five

consecutive times.  He was succeeded by his son Bashar al-Assad in 2000.   Bashar al-Assad was confirmed as President, leader of the Ba'ath Party and leader of the Army, for a 7-year term, by an unopposed referendum held in 2001 in which he claimed 97.2% of the vote.  He was re-appointed in another unopposed referendum in 2007, this time claiming 97.6% of the vote.

43.     Members of President al-Assad's own minority sect, the al-Awali clan, control most key positions in the Syrian military and Syrian intelligence and security services.  The Ba'ath Party is heavily influenced by the Syrian military and Syrian intelligence and security services, the former consuming a large share of Syria's economic resources.  The President and his senior aides in the Syrian military and Syrian intelligence and security services make most important decisions in Syrian political and economic life.

44.     There are more than a dozen security services in Syria, some overlapping in their domains, to make sure that the whole of Syrian territory is covered.  These security services answer directly to President Bashar al-Assad, his brother General Maher al-Asad, commander of the Syrian Republican Guard, and his brother-in-law General `Asif Shawkat.  General Shawkat is married to Bushra al-Assad, President al-Assad's sister.  In 2001, General Shawkat was named Deputy Director of Syrian Military Intelligence, one of the main branches of the Syrian intelligence apparatus. From 2005 to 2009, he assumed control of the entire Military Intelligence apparatus. In July 2009, he was upgraded to the rank of General and named as deputy Chief of Staff.

45.     Syria is a dictatorship and the security services cannot and do not act on the scale required to facilitate, coordinate and support the insurgency in Iraq, al-Zarqawi, al-Masri or AQI without President al-Assad's explicit authorization.

46.     It is clear that support for al-Zarqawi, al-Masri and AQI from Syrian territory or Syrian government actors could not have been accomplished without the authorization of the Syrian government and Syrian Military Intelligence through President al-Assad and General Shawkat.  Syria's own Foreign Minister once publicly admitted, with reference to terrorist attacks carried out by the Abu Nidal Organization with Syrian material support and sponsorship, "Whoever knows my government must realize that such attacks could not be carried out without its awareness."

47.     A U.S. Department of State Bulletin published in 1987 states: "Available evidence indicates that Syria prefers to support groups whose activities are generally in line with Syrian objectives rather than to select targets or control operations itself. Damascus utilizes these groups to attack or intimidate enemies and opponents and to exert its influence in the region. Yet at the same time, it can disavow knowledge of their operations. Such Syrian-supported groups have carried out scores of attacks against Palestinian and other Arab, Turkish, Israeli, and Western targets…"

48.     The Bulletin lists many examples of Syrian material support and sponsorship of terrorism and terrorist organizations.  A sampling of these includes:

a.   The suicide truck bombing of U.S. Marine barracks in Beirut, Lebanon, on October 23, 1983, in which 299 American and French servicemen were killed, an operation attributed by then U.S. Secretary of Defense Caspar

Weinberger to "basically Iranians with sponsorship and knowledge and authority of the Syrian government";

b.  The July 1985 assassination of Jordanian diplomat Ziad Sati in Ankara, Turkey. Turkish authorities issued an arrest warrant for the Syrian Embassy Second Secretary, Mohammed Darwichi. The chief defendant in the trial, who was employed as a translator in the Jordanian embassy, carried a Syrian passport. During the trial, he confessed to having worked for Syrian intelligence, stating that his control officer was a Syrian diplomat in Turkey who had given the order to assassinate Sati;

c.  The hijacking of Egypt Air Flight 648 on November 23, 1985;

d.  The simultaneous massacres of air passengers at the TWA and El Al tickets counters at the Fiumicino Airport in Rome, Italy, and the Schwechat Airport in Vienna, Austria, on December 27, 1985;

e.  The March  29, 1986 bombing of the German-Arab Friendship Union in West Berlin, injuring 11 persons, which, according to the sworn statement of one of the convicted terrorists, Amad Hasi, was carried out using a bomb that he picked up at the Syrian Embassy in East Berlin from a Syrian Air Force intelligence officer;

f.  The attempted bombing of El Al Flight 016 on April 17, 1986, which, according to the confession that convicted Jordanian terrorist Nezar al-Hindawi, the brother of Ahmad Hasi, made to British police, was planned with the help of Syrian military intelligence officers (including *inter alia* the Chief of Syrian Air Force Intelligence Brigadier General Nuhammad

al-Khuli, one of President Hafez al-Asad closest aides), and the Syrian

Ambassador in London, who supplied him with a Syrian passport,

$12,000, Semtex explosives which he planted in the luggage of his

pregnant Irish fiancée and a disguise as a Syrian Arab Airlines crew

member;

g.   The attempted bombing of an El Al plane on June 26, 1986, in Madrid,

Spain, by a Spanish member of the Syrian sponsored Abu Musa terrorist

organization, carrying a Syrian passport; and

h.   Support and sponsorship of the Abu Nidal Organization, the Abu Musa

Group, the Popular Front for the Liberation of Palestine, the Japanese Red

Army, the Kurdish Labor Party, the Armenian Secret Army for the

Liberation of Armenia and the Lebanese Armed Revolutionary Faction.

49.     More recently, Syria has provided material support and sponsorship to

Hamas, Hezbollah, Palestinian Islamic Jihad and AQI.

50.     Al-Zarqawi was arrested and imprisoned in Iran for a few weeks in early

2002. The Iranian authorities released him because he had a valid Syrian passport issued

by the Syrian authorities, indicating that he worked for Syria.  Syria is Iran's closest ally

and the two countries have been partners in terrorism since the early 1980s. Al-Zarqawi

left Iran for Syria, via Iraq.

51.     Al-Zarqawi was physically in Syria from May to September 2002.  He used

Syria as a base for plotting to assassinate Foley.  He arranged for his AQI terrorist

conspirators to be trained in Syrian military barracks, and he provided supervision and

organized financing for the assassination from Syria.  Syria protected and refused to

extradite Shaker al-Absi, a key al-Zarqawi associate responsible for financing the assassination, to Jordan.

52.    The U.S. Department of State, in its 2009 Country Reports on Terrorism, states: "Prior to 2005, AQI planned and conducted limited attacks in Jordan, including the assassination of USAID official Laurence Foley in 2002." The report also found Syria continues to embrace terrorism as an instrument of policy.  The report further noted Jordanian intelligence officials had intercepted AQI agents who were trying to enter Jordan from Syria to participate in a campaign of terrorism against Jordan.

53.    At all times relevant to this Complaint, Syria materially supported al-Zarqawi, his successor al-Masri and AQI in their campaign to use terrorism to destabilize Iraq and eject American forces from Iraq by *inter alia* (1) facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq, (2) harboring and providing sanctuary to AQI terrorists and their logistical and supply network, and (3) financing al-Zarqawi, al-Masri and AQI. In the words of the former defense minister of Iraq, Sa`dun al-Dulaimi: "We know the terrorists have no other gateway into Iraq but Syria."

54.    At all times relevant to this Complaint, Syria furnished various kinds of material support, within the meaning of 28 U.S.C. § 1605A, including, but not limited to:

    a.   AQI recruits received weapons in Syria and then they were smuggled into Iraq with the full knowledge of the Syrian security services;

     b.   funds raised by AQI in various Arab countries, especially in Jordan (al-Zarqawi's native country) and Saudi Arabia, were funneled through Syria; and

     c.   AQI recruits were trained in Syrian military barracks and were given logistical support from the Syrian military security apparatus headed by General Shawkat, President Bashar al-Assad's brother-in-law and the second-most-powerful official in Syria.

55.    The comfort and safe haven provided by Syria and its security services allowed al-Zarqawi and other AQI fighters to move back and forth between Iraq and Syria at will.

56.    When AQI executed Berg, Maupin, Armstrong and Hensley, al-Zarqawi had been physically in Iraq, but Syria remained his haven. Al-Zarqawi operated by staying at the edges of the urban centers and close to the desert for escape routes. Therefore it is likely that from time to time he commanded AQI from within Syrian borders.

57.    The United States Department of State in its 2005 Patterns of Global Terrorism concluded Syria was a "facilitation hub for terrorists operating in Iraq . . ."

58.    In 2007, Senator Joseph Lieberman publicly charged: "Al-Qaida in Iraq is sustained by a transnational network of facilitators and human smugglers, who replenish its supply of suicide bombers – approximately 60 to 80 Islamist extremists, recruited every month from across the Middle East, North Africa and Europe, and sent to meet their al-Qaida handlers in Syria, from where they are taken to Iraq to blow themselves up to kill countless others."

59.     The U.S. Department of State, in its 2008 Country Reports on Terrorism, stated: "The United States continued its focused efforts to mitigate the threat posed by foreign fighters in Iraq. State sponsors of terrorism, Iran and Syria, continued to play destabilizing roles in the region."  It also noted that "nearly 90% of all foreign fighters entering Iraq are transiting from Syria."

60.     On February 28, 2008, pursuant to Executive Order 13224, which targets terrorists and those providing financial or other material support to terrorism, the U.S. Department of the Treasury designated Badran Turki Hishan Al Mazidih a.k.a. Abu Ghadiyah, and three other men.

61.     The Treasury designation states that al-Zarqawi had appointed Abu Ghadiyah as AQI's Syrian commander for logistics in 2004, and that after al-Zarqawi's death Abu Ghadiyah and his AQI logistics network continued to work under the command of al-Zarqawi's successor al-Masri.  The designation states that Abu Ghadiyah, from his base in Syria, ran the AQI facilitation network, controlling the flow of money, weapons, terrorists and other resources through Syria into Iraq.  It states that Abu Ghadiyah obtained and provided false passports, weapons, guides, safe houses and allowances to AQI terrorists in Syria preparing to cross the border into Iraq.

62.     On October 28, 2008, after Syria's repeated refusals to capture, hand over or kill Abu Ghadiya and shut down his AQI logistics network in Syria, U.S. special forces attacked Abu Ghadiya's and his AQI logistics network on Syrian territory.  The Assad regime condemned the American attack on AQI terrorists harboring in Syria as "serious aggression."

63.     Syria regarded AQI as indispensable for Syrian interests in the region.
Syria fully supported AQI in order to inflict heavy causalities on the U.S. forces in Iraq
so that the U.S. would be compelled to withdraw in a humiliating manner from Iraq.  This
would make it more difficult than ever for the U.S to intervene to change the regimes in
Syria or in Iran, Syria's close ally.  By fully supporting the insurgency in Iraq and
especially AQI, Syria has gained in prestige and stature in the Arab and Islamic worlds.

64.     Syria also supported the insurgency to protect itself against the spread of
American democracy and the threat of a possible American invasion from Iraq.  Paranoia
descended upon Damascus and the Syrian regime after Iraq collapsed like a house of
cards in the face of the American invasion.  The United States Army was now positioned
next door with the explicit goal of spreading democracy to a neighborhood of tyrannical
regimes, such as the dictatorship that ruled over Syria.  Various US policy makers made
statements regarding the wisdom of sending the troops into Damascus next.  "'There's
got to be a change in Syria', [Paul] Wolfowitz said in April, adding that the government
was a 'strange regime, one of extreme ruthlessness.'  At the same time, another
prominent conservative closely associated with Wolfowitz and [Richard] Perle, in
particular, former CIA director James Woolsey, was widely quoted on television as
saying that the 'war on terrorism' should be seen as 'World War IV' that should include
as targets 'fascists of Iraq and Syria.'"

65.     The provision of material support and resources to AQI, a known terrorist
organization, by the government of Syria, acting directly and by and through their
individual governmental leaders and representatives as named in the Complaint, and by
other representatives of the government, constitute violations of applicable and numerous

United States laws, thereby rendering the government of Syria and its security agencies, and their individual governmental representatives named as Defendants herein, jointly and severally liable for their illegal acts and deeds.

## COUNT I INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, INCLUDING SOLATIUM
### (Under 28 U.S.C. § 1605A(c) and State Common Law)
### (As to All Plaintiffs)

66.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all of the forgoing paragraphs as if fully set forth.

67.    The kidnapping, torture and execution of Keith Matthew Maupin, the publication of a video of Keith Matthew Maupin held at gunpoint in captivity, and each and all of the acts set forth above, constitute extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon him and the members of his family.  Further these acts were undertaken for the purpose of causing mental duress and suffering, including solatium, upon the members of his family.

68.    As a direct result and proximate result of the willful, wrongful and intentional acts of al-Zarqawi, al-Masri and AQI, which acts were materially supported and sponsored by Syria as well as the Syrian Military Intelligence, President Bashar al-Assad, and General `Asif Shawkat, Matt Maupin and his family, as above set forth, were each caused to suffer permanent and severe emotional distress.

**WHEREFORE,** Plaintiffs Kent M. Maupin, Lee Ann Cottrell, and Stephen M. Spencer, demand that judgment be entered, jointly and severally, against Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **TEN MILLION ($10,000,000.00) DOLLARS** for each of them, on this Count I, and their costs expended;

## COUNT II – ACTION FOR CONSPIRACY
### (Under 28 U.S.C. § 1605A(c) and State Common Law)
### (As to All Plaintiffs)

69.   Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

70.   Defendants Syria, as well as the Syrian Military Intelligence, President Bashar al-Assad and General `Asif Shawkat, did knowingly and willfully conspire with and/or agree to sponsor a terrorist organization within the meaning of 28 U.S.C. § 1605A, which terrorist organization willfully and deliberately committed an act of terrorism, which caused the personal injuries and death of Keith Matthew Maupin and the aforesaid emotional distress, including solatium, to the Plaintiffs.

71.   For the reasons stated above, and having conspired to sponsor the terrorist organization which willfully and deliberately committed an act of terrorism which caused the personal injuries and death of Keith Matthew Maupin and the aforesaid emotional distress, including solatium, to the Plaintiffs, Defendants are jointly and severally liable to Plaintiffs for all damages in this civil action.

**WHEREFORE,** Plaintiffs Kent M. Maupin, Lee Ann Cottrell, and Stephen M. Spencer, demand that judgment be entered, jointly and severally, against Defendants in the amount of **TEN MILLION ($10,000,000.00) DOLLARS** for each of them, on this Count II, and their costs expended.

## COUNT III – ACTION FOR AIDING AND ABETTING
### (Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)
### (As to All Plaintiffs)

72.   Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

21

73.     Defendants Syria as well as the Syrian Military Intelligence, President Bashar al-Assad and General `Asif Shawkat did knowingly and willfully provide substantial assistance to and sponsor a terrorist organization within the meaning of 28 U.S.C. § 1605A, which terrorist organization willfully and deliberately committed an act of terrorism, which caused the personal injuries and death of Keith Matthew Maupin and the aforesaid emotional distress, including solatium, to the Plaintiffs.

74.     For the reasons stated above, and having aided and abetted a terrorist organization which willfully and deliberately committed an act of terrorism which caused the personal injuries and death of Keith Matthew Maupin and the aforesaid emotional distress, including solatium, to the Plaintiffs, all Defendants are jointly and severally liable to Plaintiffs for all damages in this civil action.

**WHEREFORE**, Plaintiffs Kent M. Maupin, Lee Ann Cottrell, and Stephen M. Spencer, demand that judgment be entered, jointly and severally, against Defendants in the amount of **TEN MILLION ($10,000,000.00) DOLLARS** for each of them, on this Count III, and their costs expended.

<u>**COUNT IV - 28 U.S.C. §1605A(c)**</u>
**(As to All Plaintiffs)**

75.     Plaintiffs repeat, re-allege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

76.     In addition, the acts of assaulting, terrorizing, holding, torturing and murdering Keith Matthew Maupin while captive, and publishing a video of Keith Matthew Maupin held at gunpoint in captivity, and each and all of the acts set forth above, constituted extreme and outrageous conduct with the intent to inflict emotional distress upon him and emotional distress, including solatium, upon members of his

family.   Further, these acts were undertaken for the purpose of causing severe mental duress and suffering, including solatium damages, upon the members of his family.

77.     The willful, wrongful and intentional acts of the terrorists were sponsored and directed by Syria, as well as the Syrian Air Force Intelligence.

78.     As a direct and proximate result of the willful, wrongful and intentional acts of the AQI members, whose acts were materially supported, sponsored, aided and directed by Defendants, Keith Matthew Maupin was tortured and killed and his family endured extreme mental anguish and emotional distress, all to their damage.

**WHEREFORE,** Plaintiffs Kent M. Maupin, Lee Ann Cottrell, and Stephen M. Spencer, demand that judgment be entered, jointly and severally, against Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **ONE HUNDRED MILLION ($100,000,000.00) US Dollars** for each of them, on this Count IV, and their costs expended; as to each of the siblings above named, in the amount of **TEN MILLION DOLLARS ($10,000,000.00)** for each and every one of them, on this Count IV, and their costs expended, including attorneys' fees.

<u>**COUNT V – PUNITIVE DAMAGES**</u>
**(Under 28 USC 1605A(c), P.L. 104-208, 110 Stat. 3009-172)**
**(As to All Plaintiffs)**

79.   Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

80.   The actions of AQI, as above set forth, were intentional and malicious and in willful, wanton and reckless disregard of the rights and well being of all Plaintiffs.  All of the acts of al-Zarqawi, al-Masri and AQI were facilitated by funding, training, and

other material support, resources and sponsorship from Syria, as well as the Syrian

Military Intelligence, President Bashar al-Assad and General `Asif Shawkat.

81.    The Defendants rendered material support to the AQI terrorists actually

carrying out the terrorist acts above described.  Under 28 U.S.C. § 1605A(c), the

Plaintiffs are entitled to an award of economic damages, solatium, pain and suffering, and

punitive damages, and same is hereby requested against the Defendants, jointly and

severally, in accordance with the provisions of 28 U.S.C. § 1605A(c) making both a state

that has been designated as a "state sponsor of terrorism" under § 6(j) of the Export

Administration Act of 1979, and an official, employee, or agent of such a state, liable for

economic damages, solatium, pain, and suffering, and punitive damages.

82.    As required by 28 U.S.C. § 1605A(c), each of President Bashar al-Assad

and General `Asif Shawkat was acting within the scope of his respective office,

employment or agency when he supplied, facilitated or authorized the provision of

material support or resources to al-Zarqawi, al-Masri and AQI and the execution of its

terrorist attacks.

**WHEREFORE,** Plaintiffs Kent M. Maupin, Lee Ann Cottrell, and Stephen M.

Spencer, demand that judgment be entered, jointly and severally, against Defendants in

the amount of **THREE HUNDRED MILLION US DOLLARS ($300,000,000.00)** for

each act of murder, on this Count V, and their costs expended. The award of punitive

damages, as requested, is to punish Defendants for their conduct in supporting terrorism

and the terrorist murderous acts described herein, and to send a message to them and

others that the United States of America and its citizens respond to the lawless acts of

terror and murder with the application of orderly justice.

## ADDITIONAL RELIEF REQUESTED

**WHEREFORE,** Plaintiffs pray that the Court grant judgment in their favor and against the Defendants, jointly, severally, and *in solido* on Counts One through Five, and grant to Plaintiffs:

- Leave of Court to amend this Complaint as the interests of justice require;

- Prejudgment interest or other appropriate interest;

- Costs and expenses;

- Attorney's fees; and

- Such other and further relief as this Honorable Court may determine to be just and appropriate under the circumstances.

June 20, 2017                    Respectfully Submitted,

/s/ Steven R. Perles
Steven R. Perles (No. 326975)
Edward MacAllister    (No. 494558)
Joshua K. Perles (D.C. Bar No. 1031069)
PERLES LAW FIRM, PC
1050 Connecticut Avenue, NW,
Suite 500
Washington, DC 20036
Telephone: 202-955-9055

*Of counsel for the Plaintiffs*
F. R. Jenkins, Esq. (Maine Bar No. 4667)
MERIDIAN 361 I.L.G., PLLC
97A Exchange Street, Suite 202
Portland, ME 04101
Telephone: 866-338-7087
Facsimile: 202-315-3894